2002 SD 38

Paul A. MUELLER and Mary Pat Mueller, Individually, and Paul A. Mueller and Mary Pat Mueller, by and on behalf of Cedar Shore Resort, Inc., Cedar Shore Development, Inc., and Al's Oasis, Inc., Plaintiffs and Appellants,

v.

CEDAR SHORE RESORT, INC.; Cedar Shore Development, Inc.; Edward G. Geddes, Individually and in his capacity as director of Cedar Shore Resort, Inc., Cedar Shore Development, Inc., DeETTE GEDDES, Individually and in her capacity as director of Cedar Shore Resort, Inc., Cedar Shore Development, Inc. and officer of Al's Oasis, Inc., Steven B. Mueller, Individually and in his capacity as director of Cedar Shore Resort, Inc., Cedar Shore Development, Inc., and officer of Al's Oasis, Inc.; Mark J. Mueller, Individually and in his capacity as officer of Al's Oasis, Inc.; Gopal Vyas, Individually and in his capacity as director of Cedar Shore Resort, Inc.; Steve Hansman, Individually and in his capacity as director of Cedar Shore Resort, Inc.; Marlene Billars, Individually and in her capacity as director of Cedar Shore Resort, Inc.; Darrel Viereck, Individually and in his capacity as director of Cedar Shore Resort, Inc.; AL's Oasis, Inc., Defendants and Appellees.

Nos. 21852, 21866.

Supreme Court of South Dakota.

Argued Nov. 15, 2001.

Decided March 20, 2002.

Michael P. Reynolds of Barker, Wilson, Reynolds & Burke, Rapid City, South Dakota, Attorneys for appellants.

Thomas J. Welk, Jeffrey C. Clapper of Boyce, Murphy, McDowell, Sioux Falls, South Dakota, Attorneys for appellees, E. Geddes, D. Geddes, S. Mueller, M. Mueller, G. Vyas, S. Hansman, M. Billars, Cedar Shore Development, Inc.

Clair R. Gerry of Stuart, Gerry & Schlimgen, Sioux Falls, South Dakota, Attorneys for appellee Cedar Shore Resort, Inc.

John S. Theeler of Morgan, Theeler, Wheeler, Cogley & Petersen, Mitchell, South Dakota, Attorneys for appellee AL'S Oasis, Inc.

GILBERTSON, Chief Justice.

[¶ 1.] Paul A. and Mary Pat Mueller brought this action against Al's Oasis, Cedar Shore Resort, Inc. (CSR), and individually named directors and shareholders of the two companies. Plaintiffs appeal the trial court's grant of Defendants' motions for summary judgment on the issues of (1) minority shareholder oppression; (2) breach of fiduciary duty; (3) tortious interference with a business relationship or expectancy; (4) pro rata contribution on a promissory note; and (5) performance under a subscription agreement. Al's Oasis, CSR and the individual defendant directors and shareholders appeal the trial court's denial of Defendants' motion for severance. We affirm in part, reverse in part, and remand for further proceedings.

## FACTS AND PROCEDURE

[¶ 2.] Paul Mueller, son of Al and Veda Mueller, is a minority shareholder in Al's Oasis, Inc. As with all of Al's children, Paul Mueller worked for the family business beginning as early as age five and continuing after college. He often worked without pay or at minimum wage to support what was considered to be a "family business." When Paul left the family business for law school, Paul's older sister, DeEtte, and her husband, Ed Geddes, returned from California to fill in the positions that Paul and Mary Pat, Paul's wife, had vacated. No promise was made to Paul or Mary Pat that jobs would be waiting for them when or if they returned. Paul did return to Oacoma after law school and established a small practice with a fellow classmate.

[¶ 3.] Al Mueller repeatedly refused Paul's demands for a formal employment contract in any area of the business, including its legal representation. Al Mueller did not sign contracts with any of his employees and he was concerned that doing so with Paul would create resentment among the siblings. At this time, however, all of the children were gifted a substantial share of the corporation, given employment (aside from Paul), salaries, and benefits. Paul did receive a $75,000 salary as compensation for the legal work done for Al's Oasis and for his service on the Board of Directors, but not for direct employment as was the case with his siblings.

[¶ 4.] In 1985, Governor William Janklow appointed a tourism task force to determine how best to capitalize on the tourism trade in South Dakota. Dave Sweet, the developer that Paul had helped recruit to join with Al's Oasis to build the Oasis Inn, and Paul's brother, Steve, were both on the task force. When Sweet's plan for a destination resort in the Missouri River Basin fell through, the Mueller family received encouragement from the Governor's office to pursue the resort development concession. Paul spearheaded the effort by starting the Oasis Management Group (OMG) with Mary Pat, DeEtte and Ed Geddes, Steve Mueller, and Steve's wife Jeannie. Each couple was one-third owner. Paul was unanimously elected President and OMG obtained the lease and concession to build Cedar Shore Resort on April 15, 1992.

[¶ 5.] Project financing was the next logical step. Paul developed a detailed business plan, which enabled Norwest Bank to approve and grant OMG a $5.5 million loan. Outside investors, however, were still essential. Therefore, to keep the family's control from being diluted, the six members of OMG formed a separate management company called Cedar Shore Development, Inc. (CSD). Paul was elected President of this corporation, as well. OMG merged with CSR and, by April 1, 1993, eight equity investors had brought $600,000 to the project. Four of the investors joined the CSR Board of Directors, bringing the total number of directors to seven, and Paul was again elected President.

[¶ 6.] Without any formal employment contract, Paul and Mary Pat both continued working full-time on the project, essentially without compensation.[1] But in June 1994, Paul received word that his brother-in-law and fellow shareholder, Ed Geddes, was meeting secretly with other shareholders to have Paul removed as president of CSR. When confronted, Ed denied these allegations. The other shareholders' concern over this family rivalry prompted them to propose that the Mueller family shareholders either buy them out or that they swap their 64 percent stock in CSR for the complaining shareholders' 24 percent stock, thus wresting control of the project from the feuding family members. Paul and Mary Pat elected to buy out the three complaining investors' shares, which resulted in more family animosity.

[¶ 7.] On August 22, 1994, at a special meeting of CSD called by DeEtte, Ed and Steve, Paul was removed as President and stripped of all involvement in the management company. Paul was, however, able to continue working on the project through CSR until January 10, 1995, when Paul was also removed as President of CSR. No reason was given for this action. As a result, Paul voluntarily resigned from CSR's Board. Additionally, Mary Pat was removed as Corporate Secretary because the Board believed she would be unable to serve objectively after Paul's removal. Thereafter, Ed Geddes assumed the role of President and the Board canceled the management contract between CSR and CSD.

[¶ 8.] When CSR turned to Al's Oasis for a much-needed capital infusion of $1.5 million, Al and Veda Mueller agreed to the contribution but Al demanded that Paul pay back all of the personal "loans" he had received from Al in the past. Paul and Mary Pat had been allowed to charge groceries and clothes to Al's Oasis over a period of years, which resulted in an un-

---

**1.** Mary Pat was paid $11 per hour for her administrative work at CSR, which amounted to $24,000 for work performed between September 1993 and January 1995.

paid balance of $140,000. Al Mueller paid this debt. He also paid debts related to Paul's law practice when it closed. Paul believed these loans had been repaid ten years earlier by his receipt of a smaller distribution of stock than that of his siblings. DeEtte and Ed, however, believed the lesser stock distribution was the result of Paul no longer working within the family business. They contacted a lawyer insisting that all of Paul's distributions received since the 1960's be applied toward "debt repayment." Finally, on April 25, 1995, the Al's Oasis Board of Directors terminated Paul's "employment" for "nonperformance." The family simply maintained that no management positions were available, that Paul was overqualified for all other positions, and that he was incapable of working due to his diabetes.

[¶ 9.] The trial court granted summary judgment to Defendants CSR, Al's Oasis and the individually named directors and shareholders. Paul and Mary Pat raise the following issues for appeal:

1. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to Paul and Mary Pat's claim of minority shareholder oppression by Al's Oasis and CSR.

2. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to Paul and Mary Pat's claim that the individually named majority shareholders breached the fiduciary duties owing to Paul and Mary Pat as minority shareholders in a close corporation.

3. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to Paul and Mary Pat's claim that the individually named directors tortiously interfered with their business relationships or expectancies in Al's Oasis and CSR.

4. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to the counterclaim by the defendant directors, Steven Mueller and Edward Geddes, for Paul and Mary Pat's pro rata contribution on the marina promissory note.

5. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to CSR's counterclaim for Paul and Mary Pat's payment due pursuant to a stock subscription agreement.

Alternatively, Defendants raise one issue for appeal:

6. Whether the trial court was clearly erroneous in denying Defendant CSR's motion for severance on grounds that trying the cases of Al's Oasis and CSR together would be unfairly prejudicial.

## STANDARD OF REVIEW

[¶ 10.] In reviewing the trial court's grant of a motion for summary judgment, we have repeatedly stated:

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law.

*Hayes v. N. Hills General Hosp.*, 1999 SD 28, ¶ 12, 590 N.W.2d 243, 247 (quoting SDCL 15–6–56(c)) (internal citations and additional citations omitted). Thus, this Court has held that, not only does summary judgment require there be no material facts at issue, but also that there be no genuine issue on the inferences to be drawn from those facts.

[¶ 11.] "Whether conduct is oppressive is a legal conclusion." *Landstrom v. Shaver*, 1997 SD 25, ¶ 37, 561 N.W.2d 1, 7 (citing *Robblee v. Robblee*, 68 Wash.App. 69, 841 P.2d 1289, 1293 (1992); *Davis v. Sheerin*, 754 S.W.2d 375, 380–81 (Tex.App. 1998)). Likewise, "[t]he existence of a fiduciary duty and the scope of that duty are questions of law for the trial court." *Landstrom*, 1997 SD 25 at ¶ 84, 561 N.W.2d at 18. We review conclusions of law *de novo*, giving no deference to the trial court. *Id.* at ¶ 37. The question of whether there has been a breach of that duty, however, is one of fact to be decided by the trial court. *Hayes*, 1999 SD 28 at ¶ 57, 590 N.W.2d at 253.

## ANALYSIS AND DECISION

[¶ 12.] **1. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to Paul and Mary Pat's claim of minority shareholder oppression by Al's Oasis and CSR.**

[¶ 13.] South Dakota has adopted the Model Business Corporations Act, which provides equitable relief for minority shareholders who have been oppressed, particularly in the context of a close corporation. *See* SDCL 47–7–34.

The Code, however, does not define what constitutes oppression. We have resolved the question "by considering oppressive actions to refer to conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." *Landstrom*, 1997 SD 25 at ¶ 38, 561 N.W.2d at 8. *See also Gimpel v. Bolstein*, 125 Misc.2d 45, 477 N.Y.S.2d 1014, 1018 (N.Y.Sup.Ct.1984) (defining oppression in context of "reasonable expectations" of minority shareholder or "burdensome, harsh and wrongful conduct" by majority shareholders). If the minority shareholder's expectations are held to be reasonable:

> A court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression.

*Landstrom*, 1997 SD 25 at ¶ 38, 561 N.W.2d at 8.

[¶ 14.] "Reasonable expectations are to be analyzed in light of the entire history of the parties' relationship, and include expectations such as participation in management of corporate affairs." *Longwell v. Custom Benefit Programs Midwest, Inc.*, 2001 SD 60, ¶ 19, 627 N.W.2d 396, 399 (quoting *Landstrom*, 1997 SD 25 at ¶ 39, 561 N.W.2d at 8).[2]

2. Paul and Mary Pat allege that the question of reasonable expectations, because it is made on a case by case basis, "is a question of fact which cannot be resolved on a motion for summary judgment." *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551, 563 (N.C. 1983) (citing *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4thCir.) (holding summary judgment not appropriate unless "it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law."), *cert. de-*

The determination of whether a stockholder's expectations are reasonable, however, must include a balancing test. The court weighs the minority shareholder's expectations against the "corporation's ability to exercise its business judgment and run its business efficiently." *Id.* There is a presumption that directors will make decisions "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Whalen v. Connelly*, 593 N.W.2d 147, 154 (Iowa 1999) (quoting *Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del.1990)). Even in the context of a close corporation, where the directors may have substantial personal interests, courts are loathe to second guess the business decisions of the directors. Robert W. Hamilton, *Business Organizations: Unincorporated Businesses and Closely Held Corporations* § 9.41 (1996). Oppression will only arise where the minority shareholder's expectations were "both reasonable under the circumstances *and* were central to the decision to join the venture." *Longwell*, 2001 SD 60 at ¶ 19, 627 N.W.2d at 399 (quoting *Landstrom*, 1997 SD 25 at ¶ 39, 561 N.W.2d at 8).

 [¶ 15.] The four categories of conduct alleged by Paul and Mary Pat to be oppressive conduct by Al's Oasis, CSR and the individually named directors or majority shareholders all amount to the deprivation of employment in a managerial capacity. "Typically, relief has been granted in non-fraud oppression cases where the majority has engaged in a freeze-out or squeeze-out conduct." *Landstrom*, 1997 SD 25 at ¶ 46, 561 N.W.2d at 10. Freeze-out or squeeze-out conduct may occur when the controlling shareholders or directors:

refuse to declare dividends; they may drain off the corporation's earnings in the form of exorbitant salaries, and bonuses to the majority shareholder-officers and perhaps to their relatives ...; they *may deprive minority shareholders of corporate offices and of employment by the company;* they may cause the corporation to sell its assets at an inadequate price to the majority shareholders.

*Id.* at ¶ 44 (emphasis added). Accordingly, we must determine whether the conduct in this case, with facts taken in a light most favorable to Paul and Mary Pat, amounted to the squeeze-out or freeze-out of Paul and Mary Pat's interests.

[¶ 16.] We recognize that shareholders of a close corporation often expect to be actively involved in its management and operation. *Balvik v. Sylvester*, 411 N.W.2d 383, 386 (N.D.1987).

Unlike the typical shareholder in a publicly held corporation, who may be simply an investor or a speculator and does not desire to assume the responsibilities of management, the shareholder in a close corporation considers himself or herself as a coowner [sic] of the business and wants the privileges and powers that go with ownership. Employment by the corporation is often the shareholder's principal or sole source of income. As a matter of fact, providing for employment may have been the principal reason why the shareholder participated in organizing the corporation.

*Id.* (citing 1 F. O'Neal and R. Thompson, *O'Neal's Close Corporations* § 1.07 (3d ed 1987) (footnotes omitted)). A common method of effectuating this squeeze-out is

---

*nied*, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951)). This Court, however, has made it clear that whether conduct amounts to oppression, including the determination of rea-

sonable expectations, is a question of law. *Landstrom*, 1997 SD 25 at ¶ 37, 561 N.W.2d at 7. We do not choose to adopt the position of the authority cited by Paul and Mary Pat.

to discharge the minority shareholder from the board of directors or from employment, while also withholding dividends, thus depriving the shareholder of his only source of income. *Balvik,* 411 N.W.2d at 387.

## [¶ 17.] A. Al's Oasis

[¶ 18.] "The term oppression is a comparative term that assumes a minority shareholder has a certain minimum economic return or right of participation ... [which] is usually judged, where applicable, by the terms on which the minority shareholder originally invested in the corporation or the promises which induced [him] to invest." Hamilton, *supra* at § 8.25. *See also Landstrom,* 1997 SD 25 at ¶ 38, 561 N.W.2d at 8 (holding 'reasonable expectations' of minority shareholders to be judged in light of *capital committed* to the particular enterprise); *Gimpel,* 477 N.Y.S.2d at 1019 (defining oppression as "a violation of fair play on which every shareholder *who entrusts his money* to a company is entitled to rely") (emphasis added). Thus, the standard is not the same where a shareholder received his shares by gift or inheritance. In those cases, the standard is somewhat lower, requiring only " 'decent' conduct by controlling shareholders." Hamilton, *supra* at § 8.25 n84.

[¶ 19.] In *Gimpel,* the court explained that the "reasonable expectations" test was not entirely appropriate where the corporation had been in existence for many years and the complaining shareholder had received his shares by gift or devise.

While the manner of [the present shareholders'] dealing with each other may in some respects resemble that of partners, it cannot fairly be said that they entered into the business with the same "reasonable expectations" as partners do. Since they all acquired their shares by bequest or gift from other parties, they in no sense chose each other as business associates.

*Gimpel,* 477 N.Y.S.2d at 1019. The court explained that only those original participants, parties that had committed capital and resources to the venture, were entitled to rely upon their "reasonable expectations."[3] *Id.* Any agreement between those parties is "personal in nature" and "will not 'run with the shares.' " *Id.* Thus, the complaining gifted shareholder was required to demonstrate, under the alternative test, that the majority shareholders' conduct was inherently oppressive. *Id.* Under that test, the court found the complaining shareholder's discharge and subsequent exclusion from corporate management in the family-owned dairy farm were not oppressive.

[¶ 20.] In this case, however, there are significant indications that Paul and Mary Pat's family members did not satisfy even this good faith and fair dealing standard. Paul claims that he was excluded from all substantive discussions concerning the management and operations of Al's Oasis. He was denied meaningful employment in the family corporation and he was excluded from discussions regarding the future development and management of Al's Oasis.[4] None of these, in and of

3. The court noted that "[e]ven if an original participant had had a reasonable expectation of personal employment, after his death the surviving shareholders would not be bound to employ any dolt who happened to inherit his stock." *Gimpel,* 477 N.Y.S.2d at 1019 n6.

4. Paul and Mary Pat's claim that they had been deprived of their right to perpetual em-

ployment in a managerial capacity at Al's Oasis would not, alone, constitute shareholder oppression. In *Willis v. Bydalek,* the court stated that discharging a minority shareholder from employment, even if the discharge is wrongful, is "simply not the sort of 'burdensome, harsh or wrongful conduct,' or 'visible departure from the standards of fair dealing'

themselves, rise to the level of inherent oppression. But the pattern of conduct, as well as the fact that it may have been done in retaliation for the problems occurring between the siblings at CSR, may be. *See, e.g., Hendrick v. Hendrick,* 755 A.2d 784, 791 (R.I.2000) (holding family members' series of coercive and retaliatory acts manifested bad faith and amounted to oppression). *Cf. Orloff v. Weinstein Enter., Inc.,* 247 A.D.2d 63, 677 N.Y.S.2d 544, 545–46 (N.Y.App.Div.1998) (noting that expectations of family member minority shareholder who had inherited interest is not comparable to that of an investor and holding exclusion from decision making or employment was not retaliatory act constituting oppression); *O'Farrell v. Steel City Piping Co.,* 266 Pa.Super. 219, 403 A.2d 1319, 1326 (1978) (holding no oppression where appellees terminated appellant "not in retaliation for her failure to sell her stock at a reduced price, but in the good faith belief that the 1967 buy-sell agreement" allowed such action).

[¶ 21.] Paul and Mary Pat were removed from their officer positions in CSR on January 10, 1995. On April 25, 1995, the Board of Directors of Al's Oasis fired Paul for alleged non-performance. Construing all inferences of fact in favor of Paul and Mary Pat, the deposition testimony of Paul, Mary Pat, Ed and DeEtte all,

at a minimum, raise genuine issues of material fact with regard to this possible retaliation. We do not hold that fair treatment means equal treatment.[5] We simply maintain that majority shareholders' conduct in a family-owned close corporation, because of the relative illiquidity,[6] must maintain a certain level of decency. Therefore, Paul and Mary Pat should have the opportunity to prove that Defendants have not satisfied the decentness standard of good faith and fair dealing.

[¶ 22.] **B. CSR**

 [¶ 23.] A somewhat different analysis is applied with regard to Paul and Mary Pat's claim against CSR and its majority shareholders and directors. Under the reasonable expectations test, Paul and Mary Pat's claim that they had been deprived of their right to perpetual employment in a managerial capacity at CSR does not constitute shareholder oppression. First, it is undisputed that there were no dividends paid to any shareholder, nor were any contemplated, even while Paul was President of CSR. Second, it is undisputed that Paul had been working without compensation and without any formal employment contract. *See* SDCL 60–4–4 (providing employment at-will may be terminated without cause). There is no pro-

---

that may constitute shareholder oppression." 997 S.W.2d 798, 802–03 (Tex.App.1999). The court held, in an at-will employment state, and in light of the broad discretion given under the business judgment rule, any expectation of continued employment without an employment contract cannot be "objectively reasonable." *Id.* at 803. South Dakota is also an employment at-will state. SDCL 60–4–4. Therefore, the same holds true here.

**5.** Neither Paul nor Mary Pat cite, nor could we find, any authority that requires all shareholders to be treated identically, particularly in a family-owned close corporation. *See*

*State v. Pellegrino,* 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599 (failure to cite supporting authority violates SDCL 15–26A–60(6) and issue is thereby waived) (additional citations omitted).

**6.** We do not go so far as to say that this illiquidity justifies a higher standard of care. While it is true that the minority shareholder who has received his shares by gift or devise "never had the opportunity to negotiate for any sort of protection," neither was he required to expose himself to any risk. *See Meiselman,* 307 S.E.2d at 558–59.

vision in either the bylaws or the shareholder's agreement[7] to indicate either Paul or Mary Pat is entitled to perpetual employment or managerial control. *See Enchanted World Doll Museum v. Buskohl*, 398 N.W.2d 149 (S.D.1986) (holding writing between parties presumed to accurately reflect parties' intent). Third, Paul and Mary Pat were both lawfully removed from their offices in compliance with the procedures set out in CSR's bylaws.[8] Paul was not removed from the Board entirely, but voluntarily resigned and both Paul and Mary Pat remain involved in the corporation by attending shareholder meetings. Finally, while Paul alleges secret meetings were conducted to have him removed as President, the only evidence he presents is an impression by a former shareholder that Ed, DeEtte, and Steve presented a united front. This, however, is not evidence of secret meetings. Paul must present more than bare allegations to survive a summary judgment.

[¶ 24.] As noted above, a minority shareholder's expectations must be balanced against the corporation's need to conduct its business in accordance with the business judgment rule. "It is not considered oppression when the controlling shareholders seek to control management and the affairs of their corporation." *Landstrom*, 1997 SD 25 at ¶ 50, 561 N.W.2d at 11. Paul and Mary Pat have merely "established that [they were] outvoted and subjectively disappointed with corporate management." *Id.* This conduct does not rise to the level of oppression.

[¶ 25.] **2. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to Paul and Mary Pat's claim that the individually named majority shareholders breached the fiduciary duties owing to Paul and Mary Pat as minority shareholders in a close corporation.**

[¶ 26.] Generally, corporation law states that, while directors owe a fiduciary duty to the corporation, shareholders do not owe a fiduciary duty to either the corporation or their fellow shareholders. Hamilton, *supra* at § 8.35. This standard is different, however, for close corporations. "[I]n almost every state, majority, dominant, or controlling shareholders, or a *group of shareholders acting together* to exercise effective control, are held to owe a fiduciary duty to minority shareholders." *Hayes*, 1999 SD 28 at ¶ 52, 590 N.W.2d at 253 (quoting *Moore v. Maine Indus. Services, Inc.*, 645 A.2d 626, 628 (Me.1994) (citation and internal quotation omitted) (emphasis in original)). This fiduciary duty is characterized by a high degree of diligence and due care, as well as the exercise of utmost good faith and fair dealing. *See id.; Landstrom*, 1997 SD 25 at ¶ 84, 561 N.W.2d at 18; *Case v. Murdock*, 488 N.W.2d 885, 889–90 (S.D.1992); *Mobridge Cmty. Indus., Inc. v. Toure, Ltd.*, 273 N.W.2d 128, 133 (S.D.1978).

[¶ 27.] **A. Al's Oasis**

[¶ 28.] Because of the potential for abuse, the scope of the fiduciary duty owed by a family-owned corporation that has gifted its shares to the shareholders is

---

7. These documents were drafted while Paul was President, discussed in shareholder meetings, and reviewed by Paul before he signed them.

8. Removal of an officer requires a majority vote of the seven directors. Because only three of the seven Board seats are controlled by Mueller family members, it seems unlikely and unreasonable that either Paul or Mary Pat could expect to remain officers indefinitely.

somewhat more limited than that duty owed in the context of a traditional close corporation. As explained above, where the shareholders receive their stock by gift and invest no capital, the shareholders' minimum economic return and right of participation become limited. Hamilton, *supra* at § 8.25. We are not prepared to allow a shareholder to use the fiduciary duty concept to rewrite the original deal he or she made with the corporation, a modification that the original parties to the transaction almost certainly would not have chosen. To do so would significantly undermine a primary method of tax planning and wealth sharing by holding family business owners hostage, subject to the demands of every gifted shareholder, whether reasonable or not. Therefore, the question is whether Paul and Mary Pat have identified in the record sufficient evidence to demonstrate that the conduct of the individually named directors, under these circumstances, amounted to something below the "decentness" standard set forth above.

[¶ 29.] Paul and Mary Pat must show evidence of bad faith or a breach of the duty of loyalty. Hallmark behavior of such a breach includes the failure to disclose information, director or shareholder self-dealing, making fraudulent misrepresentations regarding past or future events, and surreptitious conduct or communications. *Hayes*, 1999 SD 28 at ¶ 57, 590 N.W.2d at 253; *Landstrom*, 1997 SD 25 at ¶¶ 84–85, 561 N.W.2d at 18; *Balvik*, 411 N.W.2d at 387; *Toure*, 273 N.W.2d at 133; *Schurr v. Weaver*, 74 S.D. 378, 384, 53 N.W.2d 290, 293 (S.D.1952).

[¶ 30.] Our conclusion above, as to Paul and Mary Pat's claim of oppression, establishes a prima facie case for breach of fiduciary duty. *See Hendrick*, 755 A.2d at 791–92; *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328

N.E.2d 505, 515 (1975); *Hayes v. Olmsted & Assoc., Inc.*, 173 Or.App. 259, 21 P.3d 178, 181 (2001) (citations omitted). Due to the facts of this case, these two claims are inextricably intertwined. Therefore, as with the oppression claim, we remand for a determination of whether Al's Oasis and its directors breached their fiduciary duty to Paul and Mary Pat.

[¶ 31.] **B. CSR**

[¶ 32.] Paul and Mary Pat claim that the trial court erred in granting summary judgment on their breach of fiduciary duty claim. The defendant directors contend that this claim was dismissed pursuant to the trial court's Order Granting Motion to Dismiss Cedar Shore Resort, Inc., As To All Derivative Claims on July 15, 1999, and has not been appealed. We agree.

[¶ 33.] The July 15 Order states "the court dismisses with prejudice all of Counts II, IV and V of the Complaint and those portions of Counts I and III which are derivative or specifically identified within this Order." This dismissal includes the claim against CSR and its individual directors for a breach of fiduciary duty. Paul and Mary Pat's notice of appeal, however, does not include the trial court's July 15 Order of dismissal. Thus, the breach of fiduciary duty by CSR and its individual directors is not before this Court. *See* SDCL 15-26A-4.

[¶ 34.] **3. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to Paul and Mary Pat's claim that the individually named directors tortiously interfered with their business relationships or expectancies in Al's Oasis and CSR.**

[¶ 35.] This Court recognized the claim of tortious interference with

business relations or expectancy in the case of *Tibke v. McDougall*, 479 N.W.2d 898 (S.D.1992). The essential elements of the claim include:

(1) the existence of a valid business relationship or expectancy;

(2) knowledge by the interferer of the relationship or expectancy;

(3) an intentional and unjustified act of interference on the part of the interferer;

(4) proof that the interference caused the harm sustained; and

(5) damage to the party whose relationship or expectancy was disrupted.

*Id.* at 908 (citations omitted). In *Nelson v. WEB Water Dev. Ass'n*, 507 N.W.2d 691 (S.D.1993), we limited this recognition by refusing to hold a corporate director or officer personally liable in a claim of tortious interference for discharging an employee, an act fully within the scope of his or her authority. Paul and Mary Pat now ask us to consider whether the officer or director may be held personally liable in a tortious interference claim where the director or officer acted in bad faith or outside the scope of employment. We decline to recognize such a claim.

[¶ 36.] "In *Tibke*, we held that to establish a 'valid business relationship or expectancy,' there had to be a showing of a 'contract or business relationship' between the plaintiff and an identifiable third party." *Landstrom*, 1997 SD 25 at ¶ 75, 561 N.W.2d at 16 (quoting *Tibke*, 479 N.W.2d at 908–09). The fact that no contract existed in this case is undisputed. In fact, Paul and Mary Pat do not even attempt to argue the existence of an implied employment contract. If they were to do so, they would eliminate any distinction between the corporation and its directors for the purpose of proving the existence of the necessary third party. *See Nelson*, 507 N.W.2d at 700. Thus, Paul and Mary Pat urge us to focus upon whether they had a valid business relationship with Al's Oasis or CSR, which was distinct from their dealings with the individual directors.[9]

[¶ 37.] The actions of directors are often indistinguishable from those of the corporations. It is for this reason that the overwhelming majority of jurisdictions refuse to hold corporate directors personally liable in tortious interference claims.

> [T]hey (defendants) had the right while acting as corporate officers and agents to counsel and advise with the defendant corporation as to the management of its affairs in all matters with which the corporation was concerned without the risk of rendering themselves personally liable to third parties for their acts in that regard if they should err. "Any other rule would make it impossible for corporate business to be carried on at all except at the peril that every agent who advised concerning corporate action would be suable under some such allegations as are made in this complaint."

*Nelson*, 507 N.W.2d at 700 (quoting *Bossuyt v. Osage Farmers Nat'l Bank*, 360 N.W.2d 769, 779 (Iowa 1985)). This is also the very rationale that spawned limited liability for corporations and the protection of the business judgment rule for directors.

[¶ 38.] The same problem exists here. In order for Paul and Mary Pat to prevail, "there must be a 'triangle'—a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who

---

9. In *Setliff v. Akins*, 2000 SD 124, ¶ 35, 616 N.W.2d 878, 889, we recognized that a valid business relationship need not be cemented by contract. At-will employment relationships may be valid business relationships for the purpose of establishing a cause of action for tortious interference. *Id.* at n6.

interfered with the plaintiff and third party." *Landstrom*, 1997 SD 25 at ¶ 75, 561 N.W.2d at 16. No such triangle existed here. The actions of the individually named directors, which Paul and Mary Pat have claimed tortiously interfered with their business relationships or expectancies, include: (1) denial of a management role in Al's Oasis; (2) denial of a management role in CSR by removing Paul as President; (3) denial of a development role by dissolving the management contract between CSR and CSD; (4) denial of meaningful employment in either of the two corporations; and (5) denial of meaningful participation in either of the two corporations by not disclosing information. These actions, however, were all done in the individual defendants' capacities as directors. Therefore, we affirm the trial court's summary judgment.

[¶ 39.] **4. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to the counterclaim by the defendant directors, Steven Mueller and Edward Geddes, for Paul and Mary Pat's pro rata contribution on the marina promissory note.**

[¶ 40.] It is undisputed that Paul executed a promissory note to Norwest Bank in the amount of $25,015, along with Ed Geddes and Steve Mueller, to pay for CSR's marina construction. Paul now contends that he does not owe on the promissory note because all three parties expressly agreed to pay the note out of CSD's earnings from the management contract with CSR. According to Paul, CSD's Board, of which Ed and Steve were members, commercially frustrated his ability to pay the note when they dissolved the management contract with CSR and removed Paul from the project. We do not agree.

[¶ 41.] While Paul and Mary Pat correctly quote the Restatement (Second) of Contracts definition of commercial frustration, the record fails to support their claim by containing evidence of its elements. The contract doctrine of commercial frustration requires proof of three elements: (1) the purpose that is frustrated must have been a principle purpose of that party in making the contract; (2) the frustration must be substantial; and (3) the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. *Groseth Int'l, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 165 (S.D.1987) (citing Restatement (Second) of Contracts § 265 (1981)). The absence of any of these elements causes the claim to fail.

[¶ 42.] First, Paul and Mary Pat have neglected to identify evidence which demonstrates how CSD's management contract with CSR was the *principal purpose* for signing the promissory note with Norwest Bank. "It is not enough that [they] had in mind some specific object without which [they] would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." *Groseth*, 410 N.W.2d at 165 (quoting Restatement (Second) of Contracts § 265, cmt a (1981)). It is conceivable that the parties, as shareholders and directors of CSR, may have executed the promissory note to benefit their corporation by facilitating the construction of its marina. Paul and Mary Pat have not alleged that the promissory note would not have been executed but for the management contract; they have only alleged that they were relying upon the management contract's earnings to repay their portion. This is not enough to satisfy the first element.

[¶ 43.] Second, Paul and Mary Pat have not demonstrated that the frustration caused them anything more than a net loss. "The fact that performance has become economically burdensome or unattractive is not sufficient to excuse performance." *Groseth,* 410 N.W.2d at 165 (citations omitted). "The frustration must be so severe that it is not fairly to be regarded as within the risks that [they] assumed under the contract." *Id.* It was surely a foreseeable possibility that CSD's earnings on the management contract would not be sufficient to pay the note when it came due. "If the event was foreseeable when the contract was made, then the party will be presumed to have assumed the risk of its occurrence." *Id.* (citing 18 Williston, *Contracts* § 1954 (1978); 17A CJS *Contracts* §§ 463(2), 464 (1963)). Thus, Paul and Mary Pat are presumed to have assumed the risk that they would have to pay their portion of the note through other means. The trial court's summary judgment for the defendant directors, Ed Geddes and Steve Mueller, on the promissory note is affirmed.

[¶ 44.] **5. Whether the trial court was correct in determining no genuine issue of material fact existed with respect to CSR's counterclaim for Paul and Mary Pat's payment due pursuant to a stock subscription agreement.**

[¶ 45.] The minutes of CSR's December 7, 1994, Board meeting reflect that "all shareholders and Directors present agreed to come up with their pro rata share of the ... subscription agreements that will be signed today." CSR asserts that the subscription agreement described in the minutes essentially involved one capital call of $500,000 that would be paid by the shareholders in two separate installments. Paul and Mary Pat, however, contend that the second installment was part of a separate contract, one they did not sign or agree upon. Therefore, we must determine whether the parties came to a meeting of the minds, with a mutual consent to contract, as to the entire sum. *See Jacobson v. Gulbransen,* 2001 SD 33, ¶ 22, 623 N.W.2d 84, 90 (citations omitted).

[¶ 46.] A contract is formed when all essential elements are met: (1) the parties are capable of contracting; (2) they consent to the subject of the contract; (3) the object of the contract is lawful; and (4) there was sufficient cause or consideration. *See* SDCL 53-1-2. As long as these elements are satisfied, and there is no statutory requirement that the contract be in writing, an oral contract is formed. *See* SDCL 53-8-1. Paul and Mary Pat do not argue that the elements of a contract were not met; they argue only that the written memorialization of the agreement was missing material terms, and therefore no meeting of the minds was achieved. It is unnecessary, however, to even consider the written agreement. Because the terms of the agreement were to be performed within one year, it is inconsequential that the subscription agreement was not signed by Paul or Mary Pat. *See* SDCL 53-8-2. The oral contract is binding.

[¶ 47.] In determining the proper interpretation of a contract, a court is to seek to ascertain and give effect to the intention of the parties. *Hisgen v. Hisgen,* 1996 SD 122, ¶ 4, 554 N.W.2d 494, 496 (citing *Chord v. Pacer Corp.,* 326 N.W.2d 224 (S.D.1982) (other citations omitted)). While they did not sign the written subscription agreement later prepared by CSR's corporate attorney, Paul and Mary Pat attended the meeting, participated in the vote, and agreed to the stock subscription amount of $500,000. They even began performance by paying the first install-

ment on the agreement. Furthermore, Paul, as President of the Board, prepared a letter to all shareholders describing the subscription agreement and method of payment, complete with a chart outlining the details:

> The call for capital is in the sum of $500,000. A chart showing the pro rata equity contribution for shareholders is enclosed with this memorandum. This chart shows the total required contribution to capital in the column entitled *Total Anticipated.* The next column entitled *December 10* sets forth equity contribution required *immediately* .... The third column entitled *January 10* sets forth the pro rata balance of the remaining equity.

(emphasis in original). Paul's own language indicates that he clearly understood and agreed to the terms set forth in the Board's minutes. Therefore, we affirm the trial court's summary judgment for CSR on the remaining installment of $59,400.

[¶ 48.] **6. Whether the trial court was clearly erroneous in denying Defendant CSR's motion for severance on grounds that trying the cases of Al's Oasis and CSR together would be unfairly prejudicial.**

[¶ 49.] Because we affirm the trial court's summary judgment on all issues appealed by Paul and Mary Pat, with regard to CSR, there is no need to determine whether the trial court was correct in denying Defendants' motion to sever.

[¶ 50.] SABERS, AMUNDSON, and KONENKAMP, Justices, and BASTIAN, Circuit Judge, concur.

[¶ 51.] BASTIAN, Circuit Judge, sitting for GORS, Acting Justice, disqualified.