#30814-a-MES
**2025 S.D. 72**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

TRIGGER ENERGY HOLDINGS, LLC,
and GULF COAST INVESTMENTS, LLC,           Plaintiffs and Appellants,

     v.

KENT STEVENS, as an individual, an
officer, and agent; TCU HOLDINGS, LLC;
and BLUEPRINT ENERGY PARTNERS,
LLC,                                       Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE DOUGLAS P. BARNETT
Judge

\* \* \* \*

DANIEL K. BRENDTRO
MARY ELLEN DIRKSEN
BENJAMIN M. HUMMEL of
Hovland, Rasmus & Brendtro Prof. LLC
Sioux Falls, South Dakota            Attorneys for plaintiffs and
                                     appellants.


MATTHEW J. MCINTOSH
ELLIOT J. BLOOM of
Beardsley Jensen & Lee Prof. LLC
Rapid City, South Dakota             Attorneys for defendants and
                                     appellees.

\* \* \* \*

ARGUED
AUGUST 27, 2025
OPINION FILED **12/22/25**

SALTER, Justice

[¶1.]        Following the sale of their membership interests in Blueprint Energy Partners, LLC, to TCU Holdings, LLC, the plaintiffs Gulf Coast Investments, LLC, and Trigger Energy Holdings, LLC, sued to reform the purchase agreement they had signed under a theory of economic duress.  The plaintiffs' complaint also alleged various tort claims and breaches of fiduciary duties.  The circuit court granted summary judgment in favor of TCU on all counts.  The plaintiffs appealed, arguing the existence of genuine issues of material fact.  We affirm the court's decision concluding there was no economic duress, and we also affirm the court's decision to grant summary judgment on the remaining claims, though under its alternative analysis.

## Factual and Procedural History

[¶2.]        Blueprint was formed in 2017 to provide services and equipment for shale oil extraction in and around Casper, Wyoming.  Initially, Blueprint included three members, each holding a one-third membership interest—Gulf Coast, Trigger, and TCU.  A fourth company—Aladdin Capital, Inc.—was appointed as Blueprint's exclusive manager.  In addition to serving as manager, Aladdin provided Blueprint with an initial $500,000 line of credit and financed its equipment purchases.

[¶3.]        Scott Keogh is the vice president of—and a 49.9% shareholder in—both Gulf Coast and Aladdin.  Waylon Geuke is the president of Trigger.[1]  Kent Stevens

---

1.    Trigger also operated in the oil and gas business in Casper, Wyoming, but Trigger specialized in the fracking process while Blueprint specialized in the "workover rig" business.  In the oil and gas well-drilling business, "workover" refers to "a variety of remedial operations on a producing well to try to

(continued . . .)

owns TCU. Given his personal experience in the oil and gas industry, Stevens was appointed as Blueprint's operations manager. In this capacity, Stevens oversaw day-to-day operations and was responsible for hiring Blueprint's workforce, most of whom had followed him from his previous employer.

[¶4.]     Blueprint was slow to take off. At the outset, the company failed to meet financial projections, struggled to pay down debt, and suffered personal conflict among its members. In Keogh's words, Blueprint immediately "started going backwards on cash" and quickly wiped out its $500,000 line of credit. At its peak, Blueprint's debt obligations, mostly to Aladdin, were close to $6 million.

[¶5.]     Blueprint's operations and initial performance became a point of contention among the members and was often discussed at their monthly meetings, which Keogh described as unpleasant. Accountability also became a source of friction for Keogh, who felt that Stevens was neither adhering to company policies nor enforcing them among his crew.

[¶6.]     For his part, Stevens found the monthly meetings unfruitful, especially when Keogh and Waylon—who Stevens saw as passive investors—criticized the company's day-to-day operations. In August 2018, Stevens expressed his desire for TCU to buy Gulf Coast's and Trigger's membership interests in Blueprint. He made

---

(. . . continued)

increase production." *Workover*, OSHA, https://www.osha.gov/etools/oil-and-gas/servicing/workover (last visited Oct. 1, 2025). A workover rig is a specific type of drilling rig that is used to perform the remedial operations. Transcontinental Energy Servs., Workover Rigs, https://tces.us/workover-rigs (last visited Oct. 1, 2025).

it clear that he did not want to work with Keogh and that he was interested in finding a financial backer to help him reorganize Blueprint's ownership structure.

[¶7.] By late 2018, Blueprint's revenue began to catch up with its initial projections. For the first time since its formation, the company consistently had positive cash flow at the end of every month. Unfortunately, the company's improved financial condition did not lead to enhanced working relations.

[¶8.] In late February 2019, Stevens, on behalf of TCU, announced his intent "to find financing or investors and" purchase Gulf Coast's and Trigger's interests in Blueprint. As reflected in his deposition testimony, Keogh took this offer seriously, explaining that he "wanted to sell the company":

> We just didn't get along. And, you know, whether you're making money or not, you have to enjoy what you're doing. And if you don't enjoy what you're doing, you should do something different. And that was where we were at. We did not work together well. And so for that reason, I was willing to consider [selling].

Stevens told Keogh and Waylon that he would make them an offer through a letter of intent (LOI) the following week.

[¶9.] While awaiting TCU's offer, Keogh and Waylon discussed Blueprint's value. Keogh felt each membership interest was worth $1.5 million, applying the following valuation method:

> I reviewed the financials. . . . I just used a multiple of EBITDA,[2] which is a very normal way of establishing a price for the sale of a company. EBITDA was around 2.7 or [2.8],

---

2. EBITDA stands for earnings before interest, taxes, depreciation, and amortization and is a method used to calculate true profitability. *See Excel Underground v. Brant Lake Sanitary Dist.*, 2020 S.D. 19, ¶ 57 n.15, 941 N.W.2d 791, 807 n.15.

approximately, at that time, February, the preceding 12 months, multiplied by 4, subtracting out the liabilities, which were almost $6 million at that time, divided by 3. And the math works out to approximately 1.7 and change. I rounded down. My number was 1.5.

[¶10.] Keogh and Waylon received TCU's written LOI on May 31, 2019. That letter reflected TCU's offer to buy the shares for $800,000 per unit. But this letter was not the first time Keogh or Waylon heard of TCU's $800,000 proposed price.

[¶11.] On several occasions between the February meeting and the May 31 LOI, Stevens told Waylon that he would "blow up the company"— meaning leave Blueprint, break his non-compete agreement, and take the employees and customers with him—if Waylon and Keogh would not accept $800,000 for their respective shares. This threat came to be known as the "dynamite option." Every time Stevens made this threat to Waylon, Waylon conveyed it to Keogh. Waylon took Stevens's threats seriously, but Keogh remained adamant that the price was open for negotiation. In his words, he "discounted" Stevens's threat: "I couldn't believe it was true that he would actually blow up the company . . . ."

[¶12.] When Keogh received the LOI, he sent it to his Sioux Falls attorney, John Mullen, who was to handle the negotiations with TCU's Wyoming attorney, Kyle Ridgeway.[3] Keogh did not personally negotiate with Stevens. As he explained, "The only negotiating occurred between Ridgeway and Mullen in the terms of the LOI and the final documents," adding "[w]e settled for the lawyers doing [the negotiating]." Once Mullen received the draft LOI from Keogh, he made

---

3. Trigger did not have an attorney of its own participate in the negotiations over the terms of the LOI or the Purchase Agreement. Waylon stated that he would be willing to sign both if Keogh felt comfortable signing.

redline edits and emailed it back to Ridgeway. In his email, Mullen conveyed that "his primary areas of adjustment [were] timing of closing, tax matters, and indemnity." Mullen and Ridgeway exchanged numerous emails and phone calls over the following days while settling the terms of the LOI.

[¶13.]     As part of the negotiations, Mullen proposed a shorter closing window and a price true-up, or adjustment to the sale price to reflect the performance of the company between the time of the agreement, itself, and the closing date. But Ridgeway explained that both items were non-negotiables.[4] So Mullen continued negotiating "to put the best deal together we could being told there would be no such adjustments." After Mullen relented on the price adjustment, Ridgeway expressed his relief that Stevens would not have to exercise the dynamite option. The attorneys ultimately agreed on the terms of the LOI, and it was set to be signed by the members on June 10, 2019, in Casper.

[¶14.]     In the days leading up to the signing of the LOI, Keogh believed the price was still open for negotiation. Up until June 6, Keogh's "intent was always to sit face to face with [Stevens]" and negotiate the final price. Even though the terms of the LOI had already been negotiated by the attorneys, he planned to travel to Casper on June 10, sit down with Stevens, and "finally discuss . . . price face to face and agree on something." In Keogh's eyes, "it's not [an agreement] until we sign it. And I was not going to sign it until we had that conversation." Keogh's plans

---

4.     The accelerated closing date of twenty-four days was rejected in favor of sixty days because twenty-four days did not allow the new investors and lender enough time to get everything in order. Though Mullen felt that the deal could be closed earlier, "it didn't shock [him] that they wanted more time to close" the deal.

changed, however, when Mullen informed him of Ridgeway's relief regarding Stevens not needing to exercise the dynamite option, and Keogh signed the LOI without addressing the price.

[¶15.]     The terms of the LOI did not foreclose Keogh from revisiting the proposed purchase price or even walking away from the sale altogether.  The LOI stated, "This Letter reflects the intention of the Parties, but for the avoidance of doubt neither this Letter nor its acceptance shall give rise to any legally binding or enforceable obligation on any Party . . . ."  Further, the LOI directly instructed the parties to negotiate a final purchase agreement: "As soon as reasonably practicable after the execution of this Letter, the Parties shall commence to negotiate a definitive purchase agreement . . . relating to Buyer's acquisition of the Ownership, to be drafted by the Parties' counsel."  The parties executed the final Membership Interest Purchase Agreement (Purchase Agreement) on July 30, 2019.

[¶16.]     However, before signing the final agreement to sell Gulf Coast's membership share, Keogh weighed his options with Mullen, who advised him of several alternatives to selling.  These options included: (1) do not sell the membership shares to TCU at all; (2) remove Stevens as Manager and trigger a mandatory buy-sell option under Stevens's written employment contract; (3) fire Stevens, hire a replacement work crew, and then sue Stevens for the resulting damages; or (4) sue Stevens for tortious interference with a business relationship.

[¶17.]     Believing that all these "were bad options," Keogh signed the Purchase Agreement, as did Waylon, selling Gulf Coast's and Trigger's ownership interests in Blueprint to TCU.  As contemplated in the LOI and Purchase Agreement, Gulf

Coast and Trigger both received $800,000 for their respective membership interests. In addition, Aladdin was paid $3,280,150.94 under a separately negotiated provision that required TCU to satisfy the outstanding Aladdin debt.

[¶18.] As part of the closing, both Keogh and Waylon signed Officer's Certificates confirming their authority to execute the Purchase Agreement for their respective companies. They also signed a Funds Flow Memorandum, which details that "to fund the payments referenced in [the Purchase Agreement], TCU ha[d] received a $3,000,000 loan from Jonah Bank of Wyoming, and a $2,500,000 capital contribution from the 'Galles Group.'" In exchange for its capital contribution, the Galles Group received a fifty percent stake in Blueprint.[5]

[¶19.] Not long after the sale, Keogh and Waylon, on behalf of Gulf Coast and Trigger, sued Stevens, TCU, and Blueprint, alleging (1) economic duress, (2) breach of the operating agreement, (3) breach of fiduciary duties, (4) tortious interference, (5) shareholder oppression, and (6) unjust enrichment and usurpation. The plaintiffs also sought an accounting, costs and attorney fees, and injunctive relief.

[¶20.] The defendants filed an initial motion for summary judgment, but for reasons not clear in the record, the circuit court never heard the motion, and the case was scheduled for trial. However, the defendants moved for summary judgment a second time, which the court granted in a written memorandum opinion and order.

---

5. The plaintiffs point out that TCU bought their shares of Blueprint for $1.6 million ($800,000 per unit) and later sold all but 16.6% of that to the Galles Group for $2.5 million.

[¶21.]        The circuit court explained that the plaintiffs entered the Purchase Agreement "knowingly, competently, and voluntarily" and, after weighing their options, made a calculated choice "to not pursue the other options provided by Mullen due to the avoidance of a less-favorable financial outcome."  Having determined that the Purchase Agreement was valid and not a product of economic duress, the court concluded that the plaintiffs waived the remainder of their claims through what the court believed to be a release in the Purchase Agreement.  But, in the alternative, the court addressed each of the remaining claims on their merits.

[¶22.]        On those remaining claims, the court concluded that the parties, through the Purchase Agreement, "agreed that the sale was in compliance with the Operating Agreement"; that Stevens's conduct did not constitute a breach of fiduciary duties; that the plaintiffs could not be oppressed shareholders because TCU was, in effect, the minority shareholder while the plaintiffs were negotiating in tandem; that the equitable remedy of unjust enrichment did not apply; that the plaintiffs' tortious interference claim failed as a matter of law because there was no "identifiable third-party"; and finally, that the request for accounting, costs and attorney fees, and injunctive relief were moot.

[¶23.]        The plaintiffs now appeal the circuit court's grant of summary judgment on each issue, arguing that genuine issues of material fact exist and that the case should be remanded for a trial by jury.

## Analysis and Decision

### *Summary judgment standard*

[¶24.]      "We review a circuit court's entry of summary judgment under" SDCL 15-6-56(c) de novo.  *Healy Ranch, Inc. v. Healy*, 2022 S.D. 43, ¶ 17, 978 N.W.2d 786, 793 (citation omitted).  Our task "is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied."  *Sacred Heart Health Servs., Inc. v. Yankton County*, 2020 S.D. 64, ¶ 11, 951 N.W.2d 544, 548 (citation omitted).  We "will affirm the circuit court's summary judgment decision if there exists any basis which supports" its ruling.  *Davies v. GPHC, LLC*, 2022 S.D. 55, ¶ 17, 980 N.W.2d 251, 258 (citation modified).

### *Economic duress*

[¶25.]      Economic duress is an "outgrowth of the common law doctrine of duress."  *Dunes Hosp., LLC v. Country Kitchen Int'l*, 2001 S.D. 36, ¶ 17, 623 N.W.2d 484, 489.  While "common law duress was concerned exclusively with either physical imprisonment or threats of serious bodily harm," the defense of economic duress recognizes that a party "in economic straits" may be coerced into entering a contract to avoid "suffering a serious business loss if accession is withheld."  *Id.* (quoting *Drier v. Great Am. Ins.*, 409 N.W.2d 357, 360 (S.D. 1987)).

[¶26.]      But it is not enough to show that the contract was entered under "the pressure of financial circumstances."  25 Am. Jur. 2d *Duress & Undue Influence* § 19, Westlaw (database updated Nov. 2025).  "[H]ard bargaining is acceptable, and even desirable, in our economic system and [will] not be discouraged by" judicial intervention.  *Id.* § 20.  We are, accordingly, reluctant to set aside a contract on the

basis of economic duress "absent special, unusual or extraordinary circumstances." *Dunes*, 2001 S.D. 36, ¶ 33, 623 N.W.2d at 492.

[¶27.] In our *Dunes* decision, we identified three constituent elements for an economic duress claim:

1. Involuntarily accepting "the terms of another";
2. Circumstances which permitted no reasonable alternative; and
3. Circumstances that "were the result of a coercive wrongful act of the opposite party."

*Id.* ¶ 19, 623 N.W.2d at 490.

[¶28.] These elements are by their nature interrelated. For example, the first two elements—involuntary acceptance and no reasonable alternative—would in many, if not all, cases contemplate overlapping considerations; if a person truly has another alternative, the decision to accept another's terms would be voluntary.

[¶29.] More traditional formulations of the economic duress doctrine often feature a two-element approach under which a party must show: (1) they have "been the victim of a wrongful or unlawful act or threat; and (2) that the act or threat deprived [them] of free or unfettered will." 28 *Williston on Contracts* § 71:17, Westlaw (database updated May 2025). We perceive no fundamental difference between this formulation and the three-element version of economic duress we described in *Dunes*.

[¶30.] Both tests are designed to assess a party's volition in light of another party's conduct. And under either formulation, economic duress exists when one party's wrongful act or threat causes such financial distress for another that it deprives the latter of their free will and judgment because they are left with no

adequate remedy or reasonable alternative but to assent to the bad actor's terms. *See* 25 Am. Jur. 2d *Duress & Undue Influence* § 19.

[¶31.] The principal advantage of the two-element formulation lies in its comparative ease of application because it eliminates overlapping elements inherent in the *Dunes* version and better emphasizes the essence of economic duress—the absence of real consent. *See Waara v. Kane*, 269 N.W.2d 395, 397 (S.D. 1978) ("The contractual defense of duress requires that there has been such constraint upon the complainant that the complainant was forced to act against his own free will." (citation omitted)).

[¶32.] Regardless of which test is used here, the plaintiffs are unable to sustain their claim of economic duress, and the circuit court correctly granted the defendants' motion for summary judgment. Even when viewed in a light most favorable to the plaintiffs, no reasonable factfinder could conclude that they entered the Purchase Agreement involuntarily.

[¶33.] Acceptance is involuntary "when the actor lacks any real choice or alternative" in any meaningful sense of the word. *Ismert & Assocs. v. New England Mut. Life Ins.*, 801 F.2d 536, 549 (1st Cir. 1986) (Breyer, J., writing for the court on Part V). The plaintiffs have cast this test as a factual one to evaluate the advisability of their competing options, but this is wide of the mark.[6]

---

6. The plaintiffs argue they were coerced into signing the Purchase Agreement because "[s]ubjectively, Gulf Coast and Trigger believed they had no other option." But "[t]he mere assertion that one's free will was subverted . . . cannot bolster a claim that is unsupported by the facts and that would otherwise not withstand a motion for summary judgment." *Freedlander Inc., The Mortg. People v. NCNB Nat. Bank,* 706 F. Supp. 1211, 1212 (E.D. Va.
(continued . . .)

[¶34.]     Though the circumstances may be economic, duress is still compulsion to an extent that a party effectively has *no* option but to accede to another's terms. In this regard, it is not the relative reasonableness of an option that lies at the heart of the economic duress doctrine; it is the *existence* of even one option that would realistically allow a party the ability to not accept the terms of another. As then-Judge Breyer explained in somewhat earthy terms in the First Circuit's *Ismert* decision, an act of will is "unfree . . . when the actor lacks any real choice or alternative ('your money or your life')." *Id.*

[¶35.]     The undisputed facts here fall short of the compulsion necessary to sustain the plaintiffs' economic duress claim; the plaintiffs had reasonable alternatives. In his deposition testimony, Keogh acknowledged that Mullen presented him with several alternatives to selling his shares, including available legal remedies. Mullen himself testified that he advised Keogh of the following alternatives:

> I advised my client that they could, as one of its alternatives, consider terminating Kent Stevens as the operations manager. In other words, causing Blueprint to terminate Kent's position of employment as an individual . . . and then his termination would then, I recommended, would then give the trigger for a mandatory buy-sell under the operating agreement.

---

(. . . continued)
    1988); *see also Berardi v. Meadowbrook Mall Co.*, 572 S.E.2d 900, 905 (W. Va. 2002) (noting that "economic duress does not turn only upon the subjective state of mind of the plaintiffs"). It is true that the test for involuntariness features some individualized, subjective aspects, *see* 28 *Williston on Contracts*, *supra,* § 71:11 (discussing how the test for involuntariness accounts for a particular plaintiff's susceptibilities), but courts "must still assess whether [a plaintiff's] claims are sufficiently supported by objective evidence that a jury should pass upon their merits." *Freedlander*, 706 F. Supp. at 1216.

> I advised them that Kent Stevens and his company would very likely resist that effort and that there would be protracted litigation regarding that and that starting a lawsuit to seek injunctive relief is different than winning a lawsuit for injunctive relief, in a timely and effective manner to preserve the company's business opportunities. But, yes, we did cover the ability to commence litigation against Kent.
>
> * * *
>
> I also advised them that they could—the fear was that if they fired Kent, they would in fact, not lose just Kent Stevens, but they would lose all of the crews, because the reality was Kent had the relationships with the crews. And I said that you could give consideration to hiring an entire crew at a material expense and that would be perhaps the measure of their damages when they sued Kent and prevailed.

[¶36.] Although Keogh was unsatisfied with these options, they were, nevertheless, real alternatives to accepting TCU's $800,000 offer.[7]

### a. The ability to sue and competent counsel during negotiations

[¶37.] Because "our legal system provides remedies which are reasonably effective in protecting the innocent against improper pressures under ordinary circumstances," John Dalzell, *Duress by Economic Pressure I*, 20 N.C. L. Rev. 237, 240 (1942), "[t]he availability of a legal resolution is one . . . circumstance" a court reviewing a claim of economic duress considers, *Dunes*, 2001 S.D. 36, ¶ 21, 623 N.W.2d at 490; *Ismert*, 801 F.2d at 549 ("Courts have consistently held that the presence of an adequate legal remedy undermines claims of economic duress.").

---

7. During his deposition, Keogh acknowledged that he also could have simply elected not to sell the membership interests of Gulf Coast to TCU.

[¶38.] In fact, in *Dunes*, we held that the plaintiff was not the victim of economic duress because it could have sued the defendant before executing the settlement agreement at issue, just as it did two months after signing the contract. 2001 S.D. 36, ¶ 32, 623 N.W.2d at 492. We also noted, in this regard, the business acumen of the plaintiff company's investors and their representation by "experienced, competent lawyers"—facts which also exist here.[8] *Id.*

[¶39.] During his deposition, Keogh testified that both he and Waylon were executive officers of their own respective companies, and he specifically acknowledged that he was a sophisticated businessperson. The plaintiffs also had the benefit of competent and experienced legal counsel to provide candid legal advice about the available options, as the excerpt from Mullen's deposition set out above indicates.

[¶40.] But Mullen's assistance was not confined to simply providing advice about how to handle Stevens's intransigence on price. Mullen also played a large role in negotiating the terms of the LOI through the negotiation and signing of the Purchase Agreement. During communications with his counterpart, Ridgeway,

---

8. In *Dunes*, we reversed a circuit court's denial of a motion for judgment notwithstanding the verdict because the facts did not support the jury's finding of economic duress. 2001 S.D. 36, ¶¶ 30–34, 623 N.W.2d at 492. There, the plaintiff tried to repudiate a settlement agreement by claiming it was procured by economic duress. *Id.* ¶ 5, 623 N.W.2d at 487. The undisputed facts, however, showed that the plaintiff had several alternatives to the settlement agreement, including "firing [the defendant] and replacing them with a new manager, running the [business] themselves, or filing suit." *Id.* ¶ 3. But instead of exercising one of these alternatives, the plaintiff decided to settle first and then sue. *Id.* ¶ 32, 623 N.W.2d at 492. Because the plaintiff's "decision to enter into th[e] settlement agreement was the result of an informed and deliberate" choice selected from reasonable alternatives, we held the economic duress claim failed as a matter of law. *Id.* ¶¶ 32–33.

Mullen proposed changes to adjust the time of closing, certain tax matters, and the indemnity provision. Ridgeway, for his part, communicated that his client had two non-negotiable items—the membership interest price and the closing date. Mullen understood this to be within the "give and take" of negotiation—"you give us the rest of [what] we want, we'll walk away from the price adjustment." So within those parameters, the plaintiffs "continued to negotiate" and "attempted to put the best deal together" knowing "there would be no [true-up price] adjustments."

[¶41.] Significant in this regard is the fact that the Purchase Agreement contemplated more than the purchase and sale of Gulf Coast's and Trigger's membership interests. Besides the sale price, Keogh's principal concern was the outstanding debt Blueprint owed to his affiliated company, Aladdin.[9] Initially, Aladdin had provided Blueprint with a $500,000 open line of credit, but the amount of credit it ultimately extended grew to over $3 million. Aladdin had, itself, borrowed the money, and Keogh was anxious to have it repaid.

[¶42.] Mullen successfully negotiated terms in both the LOI and the Purchase Agreement that satisfied the debt to Aladdin even though, strictly speaking, Aladdin was unconnected to the equity buyout *and* Blueprint was making regular payments and reducing the debt incrementally each month. As a result, at closing, Aladdin received $3,280,150.94, allaying Keogh's repayment concerns and giving it, at least in part, exactly what it wanted.[10] *See JPM, Inc. v. John Deere Indus.,*

---

9. Keogh was a co-owner of both Gulf Coast and Aladdin.

10. The plaintiffs appear content to retain the benefit of this repayment to Aladdin and have asked for a very limited type of contract reformation in

(continued . . .)

*Equip. Co.*, 94 F.3d 270, 272 (7th Cir. 1996) (stating that when a contract is entered with the hope or expectation of obtaining a benefit, "there is not duress" (citation omitted)).

### b.    Length of negotiation period

[¶43.]    Beyond this, the undisputed facts surrounding the transaction preclude any reasonable inference that the plaintiffs' decision to enter into the Purchase Agreement was rushed or uncounseled, as is often the case in successful economic duress claims. *See Freedlander*, 706 F. Supp. at 1217 ("[D]uress is usually marked by immediacy.").

[¶44.]    For example, in *Bakerman v. Sidney Frank Importing Company*, No. 1844, 2006 WL 3927242, at *4–5, 17 (Del. Ch. Oct. 10, 2006), the Delaware Court of Chancery determined that a plaintiff's will was overridden when, after months of secret negotiations, he was presented with an "eleventh hour ultimatum" that gave him only 30 minutes to either sell his shares for "$0.475 on the dollar" or "have his employment terminated . . . and be sued by [the defendants]." The plaintiff was also denied the opportunity to "confer with counsel" within those 30 minutes. *Id.* at *17; *see also Berardi*, 572 S.E.2d at 906 ("[W]here an experienced businessman takes sufficient time, seeks the advice of counsel[,] and understands the content of what he is signing[,] he cannot claim the execution of the release was a product of duress." (quoting *Schmalz v. Hardy Salt, Co.*, 739 S.W.2d 765, 768 (Mo. Ct. App. 1987)))

_____

(. . . continued)
their complaint that would reform the Purchase Agreement to allow *only* a price adjustment.

[¶45.] But here there was no immediacy. The lapse of time between when the plaintiffs first learned of TCU's desire to buy their shares—August 2018—and when the Purchase Agreement was executed—July 2019—spans nearly one year. And even the specific timeframe for negotiating and drafting the LOI was not rushed. Stevens originally stated that TCU would provide Keogh and Waylon a draft LOI during the first week of March, but he did not end up doing so until the last day of May. Notably, it was the plaintiffs who proposed an accelerated closing deadline—a proposal *the defendants* ultimately rejected. And the actual negotiations between the parties' attorneys spanned sixty days and included two separate written agreements—the LOI and the final Purchase Agreement.

[¶46.] On these undisputed facts, the plaintiffs simply cannot "demonstrate that no reasonable alternative existed but to accede to" TCU's terms. *Dunes*, 2001 S.D. 36, ¶ 32, 623 N.W.2d at 492. After reviewing the record in a light most favorable to the plaintiffs, the circumstances here are not "special, unusual or extraordinary." *Id.* ¶ 19, 623 N.W.2d at 489. Accordingly, the plaintiffs cannot, as a matter of law, establish economic duress.[11]

***The effect of section 2.03***

[¶47.] Section 2.03 of the Purchase Agreement provides as follows:

---

11. We note parenthetically that our decision here is consistent with our general aversion to judicial intervention in private agreements, particularly those that are designed to resolve disputes. *See, e.g.*, *Parkhurst v. Burkel*, 1996 S.D. 19, ¶ 12, 544 N.W.2d 210, 212 (observing that public policy "favors the compromise and settlement of disputed claims outside of court"); *A. Unruh Chiropractic Clinic v. De Smet Ins.*, 2010 S.D. 36, ¶ 18, 782 N.W.2d 367, 373 (collecting cases stating the same).

> **Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) regarding to or affecting the Membership Interests; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

[¶48.] The circuit court accepted the defendants' argument that the last sentence of Section 2.03 operates as a release that waived the plaintiffs' remaining claims. In the court's view, "[t]his language clearly and unambiguously exhibits Plaintiffs' recognition and agreement that nothing was present at the time of formation that would give rise or serve as a basis to sue . . . on Plaintiffs' remaining claims, as they all are alleged to have occurred before the or during formation of the Purchase Agreement."

[¶49.] We read Section 2.03 differently. It is not a release; it is a seller's warranty and representation. *See Alexander v. Est. of Hobert*, 2025 S.D. 39, ¶ 16, 24 N.W.3d 758, 764 (holding "contract interpretation is a question of law reviewed de novo" (citation modified)).

[¶50.] A release "is a direct and immediate destruction of a claim terminated by mutual agreement." 29 *Williston on Contracts*, *supra,* § 73:1; *see also Fenske Media Corp. v. Banta Corp.*, 2004 S.D. 23, ¶ 8, 676 N.W.2d 390 ("Releases are contractual agreements." (citation omitted)). "Stated somewhat differently, a release is a binding agreement between the parties under which at least one party to the agreement relinquishes an existing claim or cause of action against another party to the agreement." 29 *Williston on Contracts*, *supra,* § 73:1; *see also Baha v. United States*, 144 Fed. Cl. 500, 504–05 (Fed. Cl. 2019) (describing a release as a

contractual agreement "whereby a party abandons a claim or relinquishes a right that could be asserted against another" (quoting *Holland v. United States*, 621 F.3d 1366, 1377 (Fed. Cir. 2010))).

[¶51.]    By contrast, representations are statements of fact. *Representation as Statement of Fact*, The Wolters Kluwer Bouvier Law Dictionary (last visited Aug. 14, 2025); *Representation*, Ballentine's Law Dictionary (3d ed. 1969). And warranties are promises about the condition and quality of the thing contracted for—in this case, the membership interests. 1 *Pirsig on Minnesota Pleading* § 4.584 ("An express warranty is a clear, positive affirmation or representation of the quality or condition of a thing sold . . . ."); *see also Warranty*, Ballentine's Law Dictionary (3d ed. 1969); *Adrian v. Elmer*, 284 P.2d 599, 602 (Kan. 1955) ("It is the general rule of law that a warranty . . . [occurs] when the seller makes an affirmation with respect to the article to be sold . . . upon which it is intended that the buyer shall rely in making the purchase.").

[¶52.]    The plain language of Article II shows that Section 2.03 was meant to serve as an affirmative representation by Gulf Coast and Trigger that the membership interests they were selling were not legally encumbered or subject to actual or potential claims and that there was no *pending* or *threatened* claim that could adversely impact or delay the transaction. None of the language within Section 2.03 clearly evinces the Seller's intent to *give up* or *relinquish* any and all legal claims arising out of or resulting from the transaction.[12]

---

12.    There is a strong indication in the record that the Blueprint members understood a release as distinguished from a representation or warranty.

(continued . . .)

[¶53.] The last sentence of Section 2.03 prompts the Seller, based on their "current actual knowledge," to represent that "[n]o event has occurred or circumstances exist that may give rise to, or serve as a basis for, any [claim, action, suit, proceeding or governmental investigation]." But the issue here is not whether the plaintiffs made misrepresentations in violation of certain warranties. We are asked only to interpret Section 2.03 to ascertain whether the parties released their claims against the defendants.

[¶54.] Finally, though not a substitute for faithful textual interpretation, we note that Section 2.03's location within the Purchase Agreement supports our view. Section 2.03 falls under Article II, which is titled, "Representations and Warranties of Seller." *See RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015) ("Generally, courts should construe contractual provisions in a manner that is consistent with the labels the parties have given them.").

[¶55.] We therefore reverse the circuit court's determination that Section 2.03 served as a waiver of rights. Since section 2.03's plain language does not support a release, it cannot serve as "a clear, unequivocal and decisive act showing an

_____

(. . . continued)
Blueprint's Operating Agreement contains a release that applies during a mandatory buy-sell event and uses traditional mutual release language that differs materially from the text of Section 2.03:

> As additional consideration for the Transfer, purchase and sale of any Units pursuant to this Agreement . . . the Transferring Member or other Seller shall forever discharge and release the Company and its other Members, managers, officers, [and] employees . . . from any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries or right to payment arising out of or resulting from the Releasor's . . . status as a Member, Manager or officer of the Company . . . .

intention to relinquish [an] existing right." *See Norwest Bank S.D. v. Venners*, 440 N.W.2d 774, 775 (S.D. 1989) (citation omitted). However, because the court made alternative rulings on the merits of the plaintiffs' remaining arguments, we continue and review those issues below.

### Breach of operating agreement

[¶56.]    The plaintiffs argue that Stevens and TCU breached Blueprint's Operating Agreement by preventing Gulf Coast and Trigger from utilizing the appraisal process set forth in Article 14.3(d)(1) to ascertain Blueprint's value and, in turn, the per unit value of the membership interests. But when Keogh was asked about this section of the Operating Agreement during his deposition, he testified that it did not apply to this transaction:

> I would note that [14.3(d)] is in conjunction with the buy-sell –
> trigger events of the buy-sell agreement. That's not what we
> were doing. . . . This wasn't -- you know, we didn't treat it – it
> probably – it could have been a trigger potentially, but it wasn't
> treated that way. It was someone – Kent expressed interest in
> buying us out and we expressed interest in selling. Valuation
> methods don't matter in terms of determining the price. Its
> what he's willing to pay or what we're willing to sell for or some
> combination thereof.

[¶57.]    This testimony is fatal to the plaintiffs' claim that Stevens and TCU breached the Operating Agreement because Keogh specifically stated that Article 14.3(d) did not apply. Our oft-quoted rule about contrary positions like this states that "[a] party cannot assert a better version of the facts than [his] prior testimony and cannot claim a material issue of fact which assumes a conclusion contrary to [his] own testimony." *St. Pierre v. State ex rel. S.D. Real Est. Comm'n*, 2012 S.D. 25, ¶ 23, 813 N.W.2d 151, 158 (citation modified).

[¶58.]     The plaintiffs' breach-of-the-operating-agreement claim is also precluded by provisions of the parties' Purchase Agreement, which we have determined to be valid and enforceable. *See supra* ¶¶ 29–47. The Purchase Agreement specifically states that neither the "consummation of the transaction" nor the execution and performance of the Purchase Agreement will "result in any violation [or] conflict with . . . the Company's organizational documents or the Operating Agreement of the Company." The circuit court properly granted summary judgment in the defendants' favor on this claim.

### Breach of fiduciary duties

[¶59.]     To recover for a breach of fiduciary duties, a plaintiff must prove: (1) that the defendant owed them a fiduciary duty; (2) that the defendant breached their fiduciary duty; (3) that the "plaintiff incurred damages; and (4) that the defendant's breach of [its] fiduciary duty was a cause of [the] plaintiff's damages." *Langbehn v. Langbehn*, 2025 S.D. 11, ¶ 30, 18 N.W.3d 634, 643 (citation omitted). "The existence and scope of a fiduciary duty are questions of law. Whether a breach of a fiduciary duty occurred, however, is a question of fact." *Smith Angus Ranch, Inc. v. Hurst*, 2021 S.D. 40, ¶ 14, 962 N.W.2d 626, 629 (citation omitted).

[¶60.]     Ordinarily, "shareholders do not owe a fiduciary duty to either the corporation or their fellow shareholders." *Mueller v. Cedar Shore Resort, Inc.*, 2002 S.D. 38, ¶ 26, 643 N.W.2d 56, 66 (citation omitted). But for close corporations, the standard is different. *Id.* "A close corporation is an entity with relatively few shareholders, whose shares are not generally traded on the securities market." *Heaton v. Rohl*, 954 N.E.2d 165, 174 (Ohio Ct. App. 2011) (citation omitted). In

South Dakota, "a group of shareholders acting together to exercise effective control, are held to owe a fiduciary duty to minority shareholders." *Mueller*, 2002 S.D. 38, ¶ 26, 643 N.W.2d at 66 (citation omitted); *see also Heaton*, 954 N.E.2d at 174 ("The shareholders in a closely held corporation owe one another a fiduciary duty to act in good faith and refrain from self-dealing." (citation omitted)).

[¶61.]  Where it exists, "[t]his fiduciary duty is characterized by a high degree of diligence and due care, as well as the exercise of utmost good faith and fair dealing." *Mueller*, 2002 S.D. 38, ¶ 26, 643 N.W.2d at 66 (citation omitted). That said, "South Dakota law reflects the traditional view that fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act primarily for another's benefit." *Smith Angus Ranch*, 2021 S.D. 40, ¶ 14, 962 N.W.2d at 629 (citation omitted).

[¶62.]  Our Legislature has also enacted the Uniform Limited Liability Company Act. SDCL 47-34A-101 to 1207. Critically, the act distinguishes the fiduciary duties owed by members in a member-managed company from those owed in a manager-managed company. *See* SDCL 47-34A-409. Members in member-managed companies owe certain fiduciary duties to the other members, including a duty of loyalty and certain other duties of care as set out in SDCL 47-34A-409(b) to (c).[13]

---

13.  For instance, under SDCL 47-34A-409(b), a member must hold company property in trust and account for it and refrain from specific types of self-dealing and competition with the company. Subsection (c) goes on to explain that: "A member's duty of care to a member-managed company and its other members in the conduct of . . . the company's business is limited to refraining

(continued . . .)

[¶63.]    In a manager-managed company, however, the duties imposed on members are different. Generally, "[a] member who is not also a manager owes no duties to the company or to the other members solely by reason of being a member." SDCL 47-34A-409(h)(1). In cases where a member exercises some, but not all, of the rights of a manager pursuant to an operating agreement, that member is subject to the duties for member-managed companies "to the extent that the member exercises the managerial authority vested in a manager by this chapter." SDCL 47-34A-409(h)(3). And non-member managers are subject to the same duties as member managers. SDCL 47-34A-409(h)(2).

[¶64.]    Here, Blueprint's Articles of Organization show that it is a "Manager-Managed" company.[14] *See* SDCL 47-34A-101(11) (defining a manager-managed company as "a limited liability company which is so designated in its articles of organization"). Blueprint's Operating Agreement further provides that the company "shall be managed by one or more Managers upon the terms and conditions set forth in this Agreement, and, to the extent not inconsistent herewith,

_____

(. . . continued)
from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." SDCL 47-34A-409(c).

14.    Initial Filing, *Articles of Organization*, Wyoming Secretary of State, https://wyobiz.wyo.gov/business/FilingDetails.aspx?eFNum=027151239234135191035167215078231212248115168216 (last visited Aug. 10, 2025) (noting formation date of Sept. 01, 2017). Although Blueprint's Articles of Organization are not provided in the record, this Court has previously taken judicial notice of articles of incorporation filed with a secretary of state's office. *See Nelson v. WEB Water Dev. Ass'n*, 507 N.W.2d 691, 693 (S.D. 1993) (taking judicial notice of "articles of incorporation filed with the Secretary of State for the State of South Dakota").

the Act."[15]  The Operating Agreement appointed Aladdin—a non-member—as the sole manager "until such time as all debt or money owed by [Blueprint] to Aladdin Capital, Inc., has been paid in full."

[¶65.]     As the *exclusive* manager, Aladdin had "full and complete discretion, power and authority to manage, control, administer and operate the business and affairs of the Company, and to make all decisions affecting such business and affairs, all without a vote of any Members being necessary."  Also, in conformity with SDCL 47-34A-409(h)(1), the Operating Agreement states that "a Member who is not also a manager owes no duties to the Company or to the other Members solely by reason of its, his or her, being a Member."

[¶66.]     So, although Blueprint likely meets the definition of a close corporation, South Dakota's Uniform Limited Liability Company Act, as well as the terms of the parties' Operating Agreement, control the existence and scope of the parties' fiduciary duties here.  Because TCU was not a manager of Blueprint at the time of the alleged wrongful conduct, it did not owe the other members any fiduciary duties.

[¶67.]     Stevens, however, was the company's operations manager, one of the designated "officer" positions identified in the Operating Agreement.  But the plaintiffs seem to conflate the two roles Stevens held—one as the operations

---

15.   The Operating Agreement defines the "Act" as "the South Dakota Limited Liability Company Act, as codified at SDCL Ch. 47-34, as amended from time to time."  However, SDCL ch. 47-34 was repealed twelve years before the agreement was signed.  *See* 2005 S.D. Sess. Law ch. 241 § 5.  South Dakota laws governing limited liability companies are now found at SDCL ch. 47-34A, which "governs all limited liability companies" after January 1, 2004.  SDCL 47-34A-1205(c).

manager and the other as TCU's agent during the buyout negotiations. Even if Stevens owed fiduciary duties to the other members in his role as operations manager, that does not mean that he owed fiduciary duties to the members while acting as TCU's agent during negotiations because TCU itself did not owe the other members any fiduciary duties. And to the extent that the plaintiffs' claims relate to any duties Stevens owed as the operations manager pursuant to SDCL 47-34A-409(h)(2), the plaintiffs have not asserted claims of breach that would meet the requirements for bringing a derivative action under SDCL 47-34A-1101.

[¶68.]       The provisions of SDCL 47-34A-1101(a) authorize a member to maintain a direct action against another member, manager, or the company to enforce the member's rights and interests. However, subsection (b) states that the member bringing such direct action "must plead an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company." The plaintiffs' claim that Stevens breached a fiduciary duty is based on his threats to "blow up the company" by resigning from his position, taking his crew with him, and possibly Blueprint's customers. Even if such threats could be deemed a breach of the duty of loyalty or good faith and fair dealing, any actual or threatened injury to the plaintiffs stemming from these threats would result solely from the threatened injury to Blueprint. Thus, the plaintiffs cannot legally sustain their breach of fiduciary duties claims on either front.

*Tortious interference with business relations*

[¶69.]      The plaintiffs allege that Stevens and TCU tortiously interfered with "a valid contractual and business relationship among Gulf Coast, Trigger, and TCU" by "threatening to destroy Blueprint unless [the plaintiffs] agreed to" TCU's buyout offer. "This cause of action [recognizes] that valid business relationships and expectancies are entitled to protection from unjustified interference." *Hayes v. N. Hills Gen. Hosp.*, 1999 S.D. 28, ¶ 17, 590 N.W.2d 243, 248 (citation omitted). Whether a plaintiff alleges tortious interference with a business relationship or an existing contract or both, we analyze them under the same essential principles. *See Tibke v. McDougall*, 479 N.W.2d 898, 908 (S.D. 1992) (noting that the tort of intentional interference with a business relationship may also "consist of injury to . . . an existing contractual relation").

[¶70.]      To prevail on a claim for tortious interference with business relationships or expectancies, the plaintiffs must prove the following elements:

> (1) the existence of a valid business relationship or expectancy;
> (2) knowledge by the interferer of the relationship or expectancy;
> (3) an intentional and unjustified act of interference on the part of the interferer;
> (4) proof that the interference cause[d] the harm sustained; and
> (5) damage to the party whose relationship or expectancy was disrupted.

*Hayes*, 1999 S.D. 28, ¶ 18, 590 N.W.2d at 248.

[¶71.]      "One is liable for tortious interference with a business relationship 'if he interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relationship with another or by preventing a third person from continuing a business relation with

another.'" *Miller v. Huron Reg'l Med. Ctr., Inc.*, No. 12-4138, 2014 WL 1608695, at *2 (D.S.D. April 22, 2014) (quoting *Setliff v. Akins*, 2000 S.D. 124, ¶ 36, 616 N.W.2d 878, 889). "[T]o withstand a summary judgment motion, a claimant need only demonstrate an intentional [and unjustified act of] interference with the business relationship which results in damage to the plaintiff." *St. Onge Livestock Co. v. Curtis*, 2002 S.D. 102, ¶ 12, 650 N.W.2d 537, 541 (citation modified).

[¶72.] Here, the undisputed material facts show that the plaintiffs were in a business relationship with Blueprint, that TCU knew of this relationship, and that TCU brought that business relationship to a close by purchasing the plaintiffs' membership interests. The essence of the plaintiffs' claim is that TCU, through Stevens, interfered with the plaintiffs' business relationship with Blueprint by threatening to "blow-up" Blueprint rather than negotiate the sale price of the plaintiffs' shares. But these negotiations took place after the plaintiffs expressed an interest in selling their shares to TCU. As such, TCU's negotiation tactics—even if heavy handed—cannot qualify as an act of interference. If the law permitted such claims, a seller of corporate equity interest could sue the buyer for interference with business relations every time they left the bargaining table feeling like they made a bad bargain.

[¶73.] Furthermore, to "prevail on a claim of tortious interference, there must be a *triangle*—a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the contractual relations." *Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 2008 S.D. 89, ¶ 7, 756 N.W.2d 399, 404 (emphasis added) (citation modified). "A third party is an indispensable element in

the tort of intentional interference with contractual relations." *Id.* ¶ 13, 756 N.W.2d at 406.

[¶74.] And here, the facts do not support the presence of a third party. Although Stevens worked for Blueprint as an operations manager, he negotiated the membership interest buyout as an agent of TCU. As the circuit court pointed out, TCU is not a third party that could have interfered with its own interests in acquiring additional shares, nor is Blueprint capable of tortiously interfering with the restructuring of its own ownership. The court properly granted summary judgment in the defendants' favor on the plaintiffs' tortious interference claim.

***Shareholder oppression***

[¶75.] The plaintiffs also allege that Stevens's threat to blow up the business rather than negotiate the membership share price constitutes shareholder oppression. Generally, shareholder oppression occurs when the "majority shareholders breach[] their fiduciary duties by actions or conduct constituting 'oppression' of the minority shareholders." 18A Am. Jur. 2d Corporations § 641, Westlaw (database updated Nov. 2025). Whether a party's conduct constitutes shareholder oppression is a question of law. *Mueller*, 2002 S.D. 38, ¶ 11, 643 N.W.2d at 62.

[¶76.] We have previously defined a shareholder's conduct as oppressive if it "substantially defeats the reasonable expectations held by minority shareholders in committing their capital to the particular enterprise." *Id.* ¶ 13 (citation modified). "Oppression will only arise where the minority shareholder's expectations were both

reasonable under the circumstances *and* were central to the decision to join the venture." *Id.* ¶ 14, 643 N.W.2d at 63 (citation modified).

[¶77.] A shareholder's expectations "are to be analyzed in light of the entire history of the parties' relationship, and include expectations such as participation in management of corporate affairs." *Id.* at 62 (citation omitted). We use a balancing test to determine "whether a [shareholder's] expectations are reasonable." *Id.* at 63. Under this test, "[t]he court weighs the minority shareholder's expectations against the corporation's ability to exercise its business judgment and run its business efficiently." *Id.* (citation modified). "There is a presumption that directors will make decisions 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.'" *Id.* (quoting *Whalen v. Connelly*, 593 N.W.2d 147, 154 (Iowa 1999)).

[¶78.] The plaintiffs' shareholder-oppression claim faces two apparent and insurmountable hurdles. First, the plaintiffs are not minority shareholders. Gulf Coast, Trigger, and TCU all owned one-third shares in Blueprint. Both Gulf Coast and Trigger wanted to sell their interests, and they were both negotiating with TCU to do so. As such, the plaintiffs were, in effect, negotiating together as majority shareholders to sell their membership interests. Because the plaintiffs were not minority shareholders, they cannot maintain a suit for minority shareholder oppression.

[¶79.] Second, the only expectation discussed by Gulf Coast or Trigger was the inclusion of a "true-up" price adjustment in the Purchase Agreement. But, for the reasons expressed above in our economic duress discussion, they have not

demonstrated how their expectation of receiving a "true-up" was "central to [their] decision to join the venture." *Id.*

[¶80.]     And even if we interpreted the plaintiffs' argument broadly to state a more abstract claim that obtaining a return on their initial investment was central to their decision to invest in Blueprint, the plaintiffs are not claiming that they did not profit from their initial investment. The sole basis for this suit is that they *might* have profited more had Stevens been more flexible in his negotiation tactics.[16] The undisputed facts present here, however, do not constitute shareholder oppression.

***Unjust enrichment/usurpation***

[¶81.]     The plaintiffs also assert an unjust enrichment claim against Stevens and TCU based on their alleged usurpation of the plaintiffs' "opportunity to have all or part of their membership [interests] bought out at a market rate." The plaintiffs contend that Stevens "orchestrated a backroom deal with Galles, without revealing the details, by [usurping] the benefits of the gap between buying Trigger['s] and Gulf Coast's shares for $1.6 million, and reselling a portion of them to Galles for $2.5 million, while [retaining] the remaining 16.6% of the shares."

[¶82.]     The circuit court granted summary judgment in the defendants' favor after concluding that "[t]he equitable remedy of unjust enrichment does not apply."

---

16.     The amount of the capital contributions for Gulf Coast and Trigger, if any, is unclear. The Operating Agreement states that the members' capital contributions are listed on an attached exhibit, but that exhibit lists no contributions for either Gulf Coast or Trigger. When the topic was raised at his deposition, Keogh indicated that Gulf Coast had contributed "debt," but, in context, this seems to be a reference to the financing role of the affiliated company, Aladdin.

The court further determined that the plaintiffs' usurpation claim failed as a matter of law because the plaintiffs voluntarily entered into a contract to sell their shares "for a different price."

[¶83.]    First, we agree that the doctrine of unjust enrichment does not apply here. "Unjust enrichment occurs when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying." *Langbehn*, 2025 S.D. 11, ¶ 49, 18 N.W.3d at 647 (citation modified). "A party alleging unjust enrichment must show that the other party both received and knew he was receiving a benefit. Additionally, it must be inequitable to allow the enriched party to retain the benefit without paying for it." *Id.* (citation omitted). But "[u]njust enrichment contemplates an involuntary or nonconsensual transfer, unjustly enriching one party." *Johnson v. Larson*, 2010 S.D. 20, ¶ 8, 779 N.W.2d 412, 416.

[¶84.]    "[T]he equitable remedy of unjust enrichment is unwarranted when the rights of the parties are controlled by an express contract." *Id.* (citation omitted). "In the contract framework, benefits are voluntarily conferred and transfers are consensual." *Id.* ¶ 9. Thus, "[w]hen there is a valid and enforceable contract," as there is here, "liability for compensation or other resolution of the breach is fixed exclusively by the contract." *Id.* (collecting cases).

[¶85.]    We have held above that the plaintiffs entered a valid and enforceable contract, free of coercion and economic duress. As a part of the Purchase Agreement, the plaintiffs voluntarily and consensually transferred their respective shares in Blueprint to TCU in exchange for $800,000 per share. Even though the

defendants may have turned around and sold those shares for more than they paid, the plaintiffs cannot, on that basis alone, claim that the transfer was non-consensual or unjust. The plaintiffs received exactly what they bargained for.

[¶86.] Second, the defendants did not usurp a business opportunity. The plaintiffs appear to couch this claim under the rubric of the doctrine of corporate opportunity. This "doctrine holds that one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy." *Case v. Murdock*, 488 N.W.2d 885, 890 (S.D. 1992).

> If the doctrine of business opportunity is to possess any vitality, the corporation or association must be given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations. Since a director is under a duty to inform the corporation of the full circumstances of the transaction, mere disclosure of the transaction, without revealing the surrounding circumstances, is not sufficient, and it has been held that the failure to make complete disclosure constitutes constructive fraud . . . .

*Id.* (quoting 3 Fletcher Cyc. of Corp., § 861.1 (1986)).

[¶87.] But here, there was no business opportunity to usurp. The members were negotiating to restructure Blueprint's ownership, not acquiring an interest in property in which Blueprint had a tangible expectancy.[17] And as part of the LOI,

---

17. Section 10.5(d)(1) of the Operating Agreement also states that "[n]o opportunity shall constitute a 'company opportunity' for purposes of § 409(b)(1) of the Act unless it is specifically identified as a company opportunity in writing by the Manager." And the plaintiffs have not, as part of their usurpation argument, provided any record of a "writing by the Manager" identifying the conduct of which they complain as a business or company opportunity.

the plaintiffs assented to an "Exclusivity" clause, whereby they agreed not to "initiate, solicit, entertain, negotiate, accept, or discuss, directly or indirectly, any proposal or offer from any person or group of persons other than [TCU] . . . to acquire all or any significant part of . . . [the] membership interests." So, to the extent there was another business opportunity, the plaintiffs voluntarily agreed not to pursue it. The plaintiffs were also aware, at least in general terms, since February 2019 that TCU needed outside investors to make the ownership restructuring feasible. Thus, the circuit court properly granted summary judgment in the defendants' favor on the unjust enrichment/usurpation claim.

***Accounting, costs and attorney fees, and injunctive relief***

[¶88.]     Because we affirm the circuit court's entry of summary judgment, the plaintiffs' claims for accounting, costs and attorney fees, and injunctive relief are rendered moot. *See Netter v. Netter*, 2019 S.D. 60, ¶ 9, 935 N.W.2d 789, 791 ("The Court will generally not rule on an issue if a decision will have no practical legal effect upon an existing controversy." (citation modified)).

## Conclusion

[¶89.]     For the reasons explained above, we affirm the circuit court's grant of summary judgment in the defendants' favor on each of the plaintiffs' claims.

[¶90.]     JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, and KERN, Retired Justice, concur.

[¶91.]     GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.